```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )     No. 4:06 CR 733 CEJ
                               )                     DDN
MALCOLM J. MURPHY,             )
                               )
            Defendant.         )

### ORDER AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This action is before the Court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on January 9, 2007.

Defendant Malcolm J. Murphy has orally moved to suppress evidence (Doc. 12), and has moved to suppress statements (Doc. 19). The government has orally moved for a hearing (Doc. 11).

From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

### FACTS
#### October 3, 2006

1.  On October 3, 2006, United States Postal Inspector Matthew Villicana went with Inspector Bruce Vollmer to interview defendant Malcolm J. Murphy at his home in St. Peters, Missouri. They arrived at the residence about 8:00 a.m. to question Murphy about a complaint of fraud made by Murphy's former employer, Webster University in St. Louis County. Both inspectors were dressed in business jackets; they were armed but their weapons were hidden. They did not tell Murphy they were coming; Murphy was a prime suspect or target of their investigation.

2.  When they arrived, Inspector Villicana knocked on the glass front door. Murphy came to the door without a shirt. The inspectors identified themselves as postal inspectors and showed him their credentials. Through the door, Murphy asked them whether they were

there to arrest him.  Inspector Villicana said, "No.  We are not here to arrest you.  We would like to interview you about the allegations by Webster.  You know why we're here, don't you?"  Murphy responded, "Yes" and he opened the door, saying "Come on in.  I'll answer your questions."  As Murphy opened the door for the inspectors, Inspector Villicana walked into the house and asked Murphy how he was going to pay the money back.  Murphy said he did not know.

    3.   Murphy led the inspectors into the foyer of his home and again asked whether they were there to arrest him.  Again, Inspector Villicana said, "No."  Murphy said he would go get a shirt and went to another room by himself and put a shirt on.  After about one minute, he returned to the inspectors.  Murphy then led the inspectors into his kitchen.  Murphy offered them seats and the inspectors sat down at a table near an island in the kitchen.  Then Murphy said he wanted to make coffee.  The inspectors said, "Fine."  As Murphy went into the cupboard and began making coffee, he said, "Go ahead and ask me questions while I am making coffee."  At that time, Inspector Villicana began asking questions about the matters under investigation and Murphy answered them, with the inspector visibly writing down Murphy's answers.  During the questioning, after making coffee, Murphy sat down in a chair with his coffee directly across the table from the inspectors.  On several occasions during the interview, Murphy asked whether he could smoke.  Inspector Vollmer said he was allergic to smoke.  Therefore, without asking for permission to do so, Murphy two or three times went into the back yard of the residence by himself to smoke cigarettes.[1]  He occasionally stuck his head back inside the residence to answer questions.  When he went into the backyard to smoke, the inspectors stayed inside in the kitchen.

    4.   At one point in the interview, Inspector Villicana asked Murphy whether he stole the money.  Murphy answered that he had not taken the money, but was being paid for services he had performed.  He answered further questions.  Once he followed up on an answer with a

---

[1] Near Murphy's chair in the kitchen was a door that led directly into the backyard.  Murphy used this door to go into the backyard to smoke.

spontaneous statement about the name of the company he used. At the end of the interview, Inspector Villicana told Murphy that his story was not making any sense and that, if he was not telling the truth, it could hurt him in the end. Murphy stated that he had agreed to answer their questions, but that he could not say what the inspectors wanted him to say. At the end of the interview, Inspector Villicana gave Murphy his business card which contained his telephone number.

5. The interview lasted slightly more than one hour. During the interview, Murphy seemed somewhat nervous. He drank four or five cups of coffee and smoked three or four cigarettes during the first 45 minutes of the interview. At no time during the interview did the inspectors tell Murphy that he had to answer their questions. Murphy never hesitated to answer the questions. No one else was in the residence besides Murphy and the inspectors. At no time did Murphy ask for the inspectors to leave the residence. Had he done so, they would have left, because they never intended to arrest him that day. At no time was Murphy placed under arrest or told he was being arrested. Murphy was never threatened during the interview; the inspectors never made any show of force to him. During the interview, the inspectors never left the kitchen and foyer areas of the residence; in fact, after entering the residence the inspectors did not ever conduct a protective sweep of the residence.

## October 18, 2006

6. On October 18, 2006, defendant Malcolm Murphy appeared before the federal grand jury and produced records and a computer as the records custodian of his company.

## October 25, 2006 (first conversation)

7. On October 25, 2006, Inspector Villicana interviewed Murphy. This interview occurred after Murphy left a voice mail message for Villicana on his office telephone. In the message Murphy asked when he would be getting his computer back. Murphy also left a telephone number for a callback. At approximately 8:45 a.m. on October 25, Inspector Villicana returned Murphy's call; the inspector did not know where

Murphy's telephone was located, other than it was in the 314 area code area. On the phone, Villicana and Murphy spoke about the computer. The inspector said they were going to analyze the computer and that Murphy would not get the computer returned until the process was completed. Murphy said he understood. Villicana asked Murphy whether he would show the inspector around Webster University and point out where he did the work for which he was paid. Murphy agreed to do this. However, Murphy said, his work would not be visible to the eye. Villicana then said that he would follow up with other contractors who might have seen Murphy do the work. Murphy said that probably would not be possible. Murphy then said, "Why don't I just tell you the locations and you can look for yourself." Villicana stated that he would prefer that Murphy personally point out the work locations, because by himself he might not be able to find them. At the end of the conversation, Murphy said he needed to call Villicana back to set up this meeting, because he was out of town at that time. They then discussed the need for Villicana to provide copies of the work invoices so that the locations of the work could be found; Villicana agreed to do this. Both Inspector Villicana and Murphy spoke in a friendly manner during this conversation.

### October 25, 2006 (second conversation)

8. At approximately 9:10 a.m., on October 25, Malcolm Murphy again telephoned Inspector Villicana at the Postal Inspection Service office and told him that he changed his mind about taking him on a tour of the college campus. Rather, Murphy said he would need a court order to take the inspector on such a tour. In response, Inspector Villicana said, "OK," without threatening Murphy in any fashion.

### October 25, 2006 (third conversation)

9. At approximately 11:20 a.m., Inspector Villicana called Murphy's number intending to ask him why he changed his mind about the tour of Webster University property. Murphy did not answer the phone and Inspector Villicana left a message for Murphy to call him. Nothing in this voice message was threatening or coercive. Murphy returned the call shortly thereafter. In the conversation, the inspector asked

Murphy, addressing him as "Malcolm," why he felt it was necessary to get a court order. In response, Murphy said he felt like the inspectors were jerking him around. Villicana explained that having Murphy personally show them where his work was would be the best way to proceed. Murphy then began to volunteer information describing work that he claimed he had done on campus. He also answered questions about this work and about the university's knowledge of it. Inspector Villicana asked Murphy why Webster University would accuse him of embezzling money. Murphy said the university was trying to discredit him because of a claim of sexual assault he had made against the university. During this telephone conversation, Inspector Villicana did not threaten Murphy and Murphy never hesitated to answer his questions and to provide information.

### November 28, 2006

10. On November 28, 2006, at approximately 10:00 a.m., Malcolm Murphy telephoned Inspector Villicana at his office. He asked again when he would get his computer back. The inspector told him that it was still being analyzed and that he might be able to get it back on the following Monday, December 4. The inspector asked Murphy questions about his health, whether Murphy was a professional engineer, whether his companies had liability insurance, and other matters. Murphy answered the questions. During the conversation, Murphy told Inspector Villicana about his father's serious illness and about his own cancer condition which he said was in remission. Murphy said he had high blood pressure and was ill.

### December 6, 2006

11. On November 30, 2006, the federal grand jury issued its indictment of Murphy in this action and an arrest warrant was issued. On December 6, 2006, Inspector Villicana telephoned Murphy and told him he could come and get his computer at the Postal Inspection Office. Murphy arrived at 11:15 a.m. and went to the fourth floor of the inspectors' office. An inspector did a pat-down search of Murphy as a safety precaution to be sure he carried no weapon. No weapon was found.

Murphy was then taken to a third floor interview room.  Murphy was seated in the room.  Inspector Villicana told him that they were finished with his computer, but that there was an indictment and he had to be placed under arrest then.  Murphy did not seem disconcerted by this information.    12.  Then, without being asked any question, Murphy asked how many counts of mail fraud were charged and whether he would be released from custody that same day.  Inspector Villicana stated the Marshals Service would deal with those issues.  Then, each of the two inspectors present placed his firearm in a secure compartment in the room.  Next, Murphy was required to give the inspectors all of his personal belongings, which were inventoried.

     13.  Then, Inspector Villicana advised Murphy of his constitutional rights to remain silent and to counsel.  Villicana read the rights to Murphy from a written Warning and Waiver of Rights form, Government Exhibit 1.  Murphy said he understood his rights.  Inspector Villicana asked Murphy whether he was willing to talk with the inspectors.  Murphy said he would do so.  The inspector asked him whether there was anyone waiting for him outside.  Murphy answered, "Yes," his wife was waiting for him in their car.  Inspector Villicana asked him what his wife's name was and Murphy said, "Mary" and that he wanted to call her on his cell phone.  Inspector Villicana said he could not make that telephone call, but that any message he had for her could be taken to her by an inspector.  At Murphy's request, Villicana gave him paper and pen and Murphy wrote her a message.  Villicana then asked another inspector to take the message to the woman whom Murphy described as waiting for him outside in a car.

     14.  Next, Inspector John Voeltz advised Murphy again of his constitutional rights to remain silent and to counsel.  He showed Murphy the written rights form, Gov. Ex. 1, and Voeltz read the form in its entirety to Murphy.  After reading the form to Murphy, Inspector Voeltz gave the form to Murphy and asked him to read it a third time.  Murphy did so and handwrote his initials next to each statement of a right and signed his name twice, the first time to express his understanding of his rights and the second to expressly voluntarily waive them. Gov. Ex. 1.

15. Next, Inspector Villicana asked Murphy questions which Murphy answered orally. When the interview ended, Murphy was placed in handcuffs. At no time during the interview did Murphy ask for an attorney or ask that the questioning stop. Murphy never said he felt ill; Murphy did not have any medications on his person. This interview lasted about one hour.

## **DISCUSSION**

The motions to suppress should be denied. The government has the burden of establishing the admissibility of a defendant's statements by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477, 489 (1972); Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The first issue is whether the defendant's statements were voluntary or involuntary. Statements are constitutionally involuntary if they are the result of government overreaching, such as mental or physical coercion, deception, or intimidation. Connelly, 479 U.S. at 169-70; United States v. Goudreau, 854 F.2d 1097, 1099 (8th Cir. 1988).

Next, the court must determine whether or not defendant was entitled to be advised of his constitutional rights to remain silent and to counsel, as prescribed by Miranda v. Arizona, 384 U.S. 436 (1966). This depends upon whether he was subjected to interrogation in a custodial setting. "Miranda warnings are due only when a suspect interrogated by the police is 'in custody.'" Thompson v. Keohane, 516 U.S. 99, 102 (1995).

Courts look to the totality of the circumstances when determining whether an individual is "in custody" for purposes of Miranda. United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002). Six commonly used "indicia of custody" are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the

> questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). "The presence of the first three indicia weighs against the existence of custody, while the presence of the latter three indicia supports the existence of custody." United States v. Martin, 369 F.3d 1046, 1047 (8th Cir. 2004).

None of defendant Murphy's statements should be suppressed. There is nothing in the facts that suggests his statements were given involuntarily.

The October 3, 2006 statements should not be suppressed. Defendant was not entitled to be advised of his rights under Miranda because, regardless of whether he was being interrogated,[2] defendant was never in custody during the interview on October 3, 2006. Defendant was being questioned and made statements in his own home. He was told at least twice he was not under arrest. The officers asked him if they could ask him questions, to which he responded "yes." His movement was never restrained, because he was free to move about the house to get dressed, he made coffee, and he went outside by himself several times to smoke cigarettes. While he seemed nervous, he never hesitated to answer the questions. There was no evidence of strong arm tactics, no weapons were displayed, and defendant was not arrested at the end of the questioning.

Defendant's October 25 and November 28, 2006 statements should not be suppressed. They were given voluntarily and he was not entitled to be advised of his Miranda rights because he was not in custody. On both of those dates, all conversations took place by telephone. Murphy initiated the contact with Inspector Villicana on October 25 by calling him and asking Villicana to return his call. Defendant and Villicana

---

[2]Some of defendant's statements that day were in response to direct questions from the inspectors. Defendant answered "yes" when asked if he knew why the inspectors were there. He answered that he did not steal the money but was paid for services when Villicana asked him if he stole the money. Other statements were spontaneous and not in response to any questions, such as when he referred to the name of a company he used.

had three separate telephone conversations that day, one of which was placed by defendant. Defendant also initiated the November 28 phone call. While some of defendant's statements were in response to questions by Villicana, defendant was obviously free to leave, end the conversation, or hang up the telephone. He and Villicana were not in the same location. He was not under arrest or restrained in movement. Therefore, defendant was not in custody and was not entitled to be advised of his rights under Miranda. There is nothing in the facts that suggests any statements made by defendant were anything but voluntary.

The statements that defendant made on December 6, 2006 should also not be suppressed. When defendant asked how many counts of mail fraud he was being charged with and if he would be released from custody, he was not being interrogated. "Voluntary statements of any kind, not made in response to police interrogation, are not barred by the Fifth Amendment and their admissibility is unaffected by Miranda and its progeny." United States v. Wood, 545 F.2d 1124, 1127 (8th Cir. 1976).

Thereafter, Inspector Villicana advised defendant of his rights under Miranda. Murphy stated that he understood these rights and stated that he was willing to talk. He waived the rights by making statements, and there are no facts indicating government coercion or overreaching to suggest that his statements were not made voluntarily. United States v. Junkman, 160 F.3d 1191, 1194 (8th Cir. 1998) (coercive police conduct needed to find statements involuntary). He further indicated his desire to waive his rights by signing the written waiver and making more oral statements. None of the statements on December 6, 2006, were involuntary. They should not be suppressed.

Whereupon,

**IT IS HEREBY ORDERED** that the motion of the government for a hearing (Doc. 11) is denied as moot.

**IT IS HEREBY RECOMMENDED** that the oral motion of defendant to suppress evidence (Doc. 12) be denied.

**IT IS FURTHER RECOMMENDED** that the motion of defendant to suppress statements (Doc. 19) be denied.

The parties are advised they have until February 9, 2007,[3] to file written objections to this Order and Recommendation. The failure to file objections may result in a waiver of the right to appeal issues of fact.

          /S/ David D. Noce
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 29, 2007.

---

[3]This is 11 calendar days from January 29, 2007. See Federal Rule of Criminal Procedure 45(a)(2).